**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

PAN 4 AMERICA, LLC, *et al.*,       *

     **Plaintiffs,**       *

v.       *      **Case No.: DLB-21-401**

TITO & TITA FOOD       *
     TRUCK, LLC, *et al.*,
     *

     **Defendants.**

## MEMORANDUM OPINION

Plaintiffs Pan 4 America, LLC ("Pan 4 America") and Super Pasteles, LLC ("Super Pasteles") filed suit against defendants Tito & Tita Food Truck, LLC ("Tito & Tita"), Aizar Mazariegos, and Ana Cecelia Ayala (the "individual defendants"), claiming:

| | | |
|---|---|---|
| I. | Violation of the Lanham Act, 15 U.S.C. § 1125(a) | against Tito & Tita |
| II. | Common law unfair competition | against Tito & Tita |
| III. | Tortious interference with economic relations | against all defendants |
| IV. | Detinue | against all defendants |
| V. | Conversion by wrongful detention | against all defendants |
| VI. | Breach of fiduciary duty | against individual defendants |
| VII. | Civil conspiracy | against individual defendants |
| VIII. | Breach of contract | against Mazariegos |
| IX. | Unjust enrichment | against all defendants |

ECF 2. Plaintiffs allege they employed the individual defendants to, in part, manage social media advertising and promotion for plaintiffs' baking businesses. Plaintiffs further allege the individual defendants "hijacked" plaintiffs' Facebook page to promote Tito & Tita, a competing business. Defendants have moved to dismiss the complaint for failure to state a claim. ECF 13. The motion has been fully briefed. ECF 14 & 15. A hearing is not necessary. See Loc. R. 105.6. For the following reasons, the motion to dismiss is granted in part as to the conversion and detinue claims and denied as to the other claims.

## I.   Background[1]

Plaintiffs together operate a retail bakery (Pan 4 America) and affiliated specialty baking business (Super Pasteles) under the registered tradename "La Baguette."  ECF 2, ¶ 2.  Pan 4 America began its retail operation in 2012, and its owners created Super Pasteles in May of 2019. *Id.* ¶¶ 22–23.  Plaintiffs regularly deliver or ship their products to consumers in Maryland, Washington D.C., Virginia, and Pennsylvania.  *Id.* ¶ 25.

Plaintiffs describe Mazariegos and Ayala as "trusted supervisory employees" who acquired "extensive knowledge of certain aspects of their business."  *Id.* ¶ 28.  In July of 2015, plaintiffs hired Mazariegos as their store manager.  *Id.* ¶ 26.  In this role, Mazariegos had authority to hire and fire employees, buy supplies, oversee the baking and delivery of products, supervise other managers, create employee schedules, discipline employees, and hand paychecks to employees. *Id.*  He was also responsible for La Baguette's online advertising and promotion.  *Id.*  Plaintiffs hired Ayala, who plaintiffs allege is now married to Mazariegos, as an in-store supervisor in September of 2015.  *Id.* ¶¶ 17, 27.  Ayala supervised cashiers and ensured that shelves and display cases were well stocked.  *Id.* ¶ 27.  Ayala also assisted Mazariegos with the management of La Baguette's Spanish-speaking social media.  *Id.*

In October of 2015, Mazariegos created a Facebook page for La Baguette that became the business's main online platform.  *Id.* ¶ 4.  Plaintiffs relied on the Facebook page in lieu of a more formal web page.  *Id.* ¶ 35. The page contained photographs and prices of La Baguette's products, the street address of the retail bakery, and a phone number to place orders for pick-up or delivery. *Id.*  ¶¶ 4, 37.  In spring of 2020, the page had over 4,000 followers, "enabling [La Baguette] to

---

[1] As is proper on a motion to dismiss, the Court takes all well-pleaded allegations contained in the complaint, ECF 2, as true. *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (citing *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)).

develop considerable goodwill with repeat customers to whom Plaintiffs could provide information relating to new and seasonal offerings, sales and other promotions." *Id.* ¶¶ 5, 35. Both Mazariegos and Ayala had administrative access to the Facebook page, allowing them to post and delete content on behalf of La Baguette. *Id.* ¶ 34.

By March of 2020, plaintiffs noted "a lack of attention and an increase in absenteeism" by Mazariegos and Ayala. *Id.* ¶ 39. On April 12, 2020, plaintiffs terminated Ayala for missing nearly three weeks of work. *Id.* ¶ 40. Ayala claimed concerns over COVID-19 but failed to provide any certification of contraction or exposure to the virus, as requested by plaintiffs. *Id.* That same day, plaintiffs learned that Mazariegos was "moonlighting" for Tito & Tita, which he described as a Mexican food-truck business. *Id.* ¶ 41. Mazariegos assured plaintiffs that Tito & Tita did not sell baked goods. *Id.* As a condition for his continued employment, plaintiffs had Mazariegos sign a non-compete agreement to last for the term of his employment. *Id.* ¶ 42. The agreement provided that employees "shall not directly or indirectly engage in any business that competes" with plaintiffs until after "they are no longer employed" by plaintiffs; any employee who violates the agreement "will be terminated" from plaintiffs' employment. *Id.*, at 39 (Ex. A).

Later on April 12 and after signing the non-compete agreement, Mazariegos changed the name of the Facebook page to "Tito & Tita Langley" and replaced the address and phone number listed on the page. *Id.* ¶ 43. Due to the nature of Facebook, this change was retroactive, meaning past events and posts by La Baguette now appeared to have been posted by "Tito & Tita Langley." *Id.* ¶¶ 45–50. Despite the changes, Mazariegos preserved some descriptions, prices and photos of La Baguette's products, as well as other content relating to plaintiffs' business. *Id.* ¶ 45. Plaintiffs identify three specific content items still remaining on the page that were originally posted by La Baguette but now appear to have been posted by Tito & Tita: events from 2016 and 2019 and a

post from 2018 advertising La Baguette's products. *Id.* ¶¶ 47, 49. Additionally, plaintiffs allege that "many consumer posts and responses thereto" that predate April 12, 2020, remain under the new name, *id.* ¶ 48, alongside "empty posts" where the content has been deleted but the posting date remains, reinforcing "the misimpression that Tito & Tita . . . is merely a continuation of or successor to the La Baguette business," *id.* ¶ 50.

Plaintiffs fired Mazariegos on April 16 after learning Tito & Tita did sell baked goods in competition with La Baguette. *Id.* ¶ 52. Plaintiffs twice requested that Mazariegos provide login information for the Facebook page as well as other social media accounts, but the information provided by Mazariegos did not work. *Id.* ¶ 53. Unable to access the Facebook page and unaware of the changes made to it by Mazariegos, plaintiffs shifted to an alternate Facebook page created by another employee. *Id.* ¶ 54. This alternate page is now the primary online platform for La Baguette, but it does not have a large following (~261 followers). *Id.* ¶¶ 55–56.

Mazariegos registered Tito & Tita as a Maryland LLC on May 5, 2020. *Id.* ¶ 57. Plaintiffs allege Tito & Tita "had been operational at least as early as March of 2020," but that Ayala and Mazariegos focused their full attention on the competing business only after their termination from La Baguette. *Id.* Defendants retained administrative access to the original Facebook page after their termination, and plaintiffs allege they used the page to falsely advertise and pass off Tito & Tita's business and products as La Baguette's. *Id.* ¶ 59. The page allowed defendants to intercept and divert orders while creating confusion among La Baguette's customers. *Id.* The page has since advertised products that are similar to those offered by La Baguette, including a popular "Unicorn Cake" with a distinctive style. *Id.* ¶ 51.

Following defendants' "hijacking" of the Facebook page, plaintiffs saw a "precipitous drop" in call-in orders. *Id.* ¶ 60. This coincided with the early months of the pandemic, which

limited in-store operations. *Id.* Plaintiffs began to suspect the decline in their business was somehow the result of Tito & Tita and the original Facebook page after they received complaints from customers about poor quality products that had in fact been ordered from and prepared by Tito & Tita. *Id.* ¶ 62. Plaintiffs allege that defendants' misconduct has caused "confusion and uncertainty in the marketplace" over the relationship between La Baguette and Tito & Tita, *id.* ¶ 65, resulting in "irreparable harm to their business, their advantageous relationships and goodwill with their consumers, and their reputation in the marketplace," *id.* ¶ 64.

Plaintiffs initially filed suit in the Circuit Court for Prince George's County on February 16, 2021. ECF 1-2. Plaintiffs assert a violation of the Lanham Act, common law unfair competition, tortious interference with economic relations, detinue, conversion, breach of fiduciary duty, civil conspiracy, breach of contract, and unjust enrichment. ECF 2, ¶¶ 71–128.

Following removal of the case to this Court, on April 25, defendants filed this motion to dismiss. ECF 13.

## II.    Standard of Review

A Rule 12(b)(6) motion to dismiss for failure to state a claim "tests the legal sufficiency of a complaint" and "should be granted unless the complaint 'states a plausible claim for relief.'" *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017), *as amended* (Jan. 20, 2017) (quoting *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012)); *see* Fed. R. Civ. P. 12(b)(6). To survive the motion, the "complaint need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)). Stated differently, the complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Importantly, a Rule 12(b)(6) motion "does not resolve contests surrounding the facts, the merits

of a claim, or the applicability of defenses.'" *Butler v. United States*, 702 F.3d 749, 752 (4th Cir. 2012) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).   In ruling on a Rule 12(b)(6) motion, the Court must accept all the plaintiff's factual allegations as true and draw all reasonable inferences in the plaintiff's favor.   *In re Birmingham*, 846 F.3d at 92 (citing *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

## III.   Discussion

### A.  False association under the Lanham Act

Section 43(a) of the Lanham Act is "an extraordinarily flexible statute" that covers a wide and evolving range of conduct.  *See* Charles E. McKenney & George F. Long III, 1 Federal Unfair Competition: Lanham Act 43(a) § 2:1 (Dec. 2021).   It sets forth causes of action for unfair competition, including false association:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A) [False Association:] is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>
> (B) [False Advertising:] [omitted]
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Lanham Act § 43(a)(1), 15 U.S.C. § 1125(a)(1).  Plaintiffs' complaint alleges a violation of § 43(a)(1), which could mean either false advertising or false association.  ECF 2, ¶¶ 73–74.  Their opposition to defendants' motion to dismiss clarified the claim is for false association under § 43(a)(1)(A).  ECF 14, at 8.  The Court will analyze the Lanham Act claim accordingly.

Per the statute's text, to state a claim of false association under the Lanham Act, plaintiffs must allege the defendants' "use[] in commerce" of "any word, term, name, symbol, or device" or "any false designation of origin, false or misleading description of fact, or false or misleading representation of fact," and that the use is "is likely to cause confusion[.]" 15 U.S.C. § 1125(a)(1); *Farm Fresh Direct Direct By a Cut Above LLC v. Downey*, No. ELH-17-1760, 2017 WL 4865481, at *8–9 (D. Md. Oct. 26, 2017); *see also Belmora LLC v. Bayer Consumer Care AG*, 819 F.3d 697, 706 (4th Cir. 2016) (describing the requirements of § 43(a)(1) claims).

Defendants argue that plaintiffs have not identified "any actual or affirmative" misleading statement or "any representation that was literally false or otherwise implied that 'Tito & Tita' was a successor or continuation of [La Baguette]."[2] ECF 13, at 6. The Court disagrees. Plaintiffs allege that Tito & Tita used several false or misleading representations of fact. They allege that (i) two historic events held by La Baguette now appear to have been held by Tito & Tita, ECF 2, ¶¶ 43, 46–47; (ii) old posts and communications on the page and interactions with La Baguette's followers now appear to have originated from Tito & Tita, *id.* ¶¶ 48–50; and (iii) Tito & Tita has passed off its products as La Baguette's, including by leaving "descriptions, prices, and photos of Plaintiffs' baked good offerings . . . on the page," *id.* ¶ 45, and mimicking distinctive product offerings, *id.* ¶ 51.[3] Additionally, due to the nature of Facebook, Facebook users who followed La

---

[2] Defendants concede that plaintiffs allege use in interstate commerce. ECF 15, at 2. The representations on a public Facebook page promoting a business were used in interstate commerce.

[3] Plaintiffs argue they allege at least one other false or misleading representation of fact—the page's "page history," which shows the name change. ECF 14, at 10 (referring to ECF 2, ¶ 33). The page history is not necessarily false or misleading; the page's name did, in fact, change. Plaintiffs perceive this as giving the misleading impression that the business's name changed. Because plaintiffs have sufficiently alleged other false or misleading representations of fact, the Court will not address the complexities that arise where a technical interpretation of a representation (page name) differs from what could be a reasonable interpretation (business name).

Baguette before the name change would now appear to have followed Tito & Tita instead. Taking these allegations as true, it follows that Tito & Tita represented it was associated with all the historic La Baguette content it failed to delete, associated with or endorsed by La Baguette as a successor, and endorsed by all La Baguette's existing Facebook followers. The analogous non-digital conduct would be to take a photograph of a crowd inside La Baguette with the caption "La Baguette, Christmas party 2016," erase "La Baguette," write-in "Tito & Tita," and keep the photograph on the wall where customers can see it. Tito & Tita allegedly modified content, rendering it false or misleading, then used that content to kick start its competing business.

Defendants also argue plaintiffs do not sufficiently allege likelihood of confusion. Again, the Court disagrees. The Fourth Circuit employs a nine-factor test to determine the likelihood of confusion:

(1) the strength or distinctiveness of the plaintiff's mark as actually used in the marketplace;
(2) the similarity of the two marks to consumers;
(3) the similarity of the goods or services that the marks identify;
(4) the similarity of the facilities used by the markholders;
(5) the similarity of advertising used by the markholders;
(6) the defendant's intent;
(7) actual confusion;
(8) the quality of the defendant's product; and
(9) the sophistication of the consuming public

*George & Co. LLC v. Imagination Ent. Ltd.*, 575 F.3d 383, 393 (4th Cir. 2009); *see also Putt-Putt, LLC v. 416 Constant Friendship, LLC*, 936 F.Supp.2d 648, 659 (D. Md. 2013) (stating the likelihood of confusion for purposes of a § 43(a) unfair competition claim is "similar to that for trademark infringement" and referring to the Court's preceding analysis of the relevant factors). These factors are not equally important, "nor are they always relevant in any given case." *George & Co. LLC*, 575 F.3d at 393 (quoting *Anheuser-Busch, Inc. v. L. & L. Wings, Inc.*, 962 F.2d 316,

320 (4th Cir. 1992)). Evidence of actual confusion is "often paramount." *Id.* (quoting *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 804 (4th Cir. 2001)).

Plaintiffs allege that customers were in fact confused about the relationship between La Baguette and Tito & Tita. ECF 2, ¶ 62. Plaintiffs further allege similarities between the baked goods sold by La Baguette and Tito & Tita, *id.* ¶ 51; similarity of advertising, *id.* ¶¶ 44, 51; malicious intent, *id.* ¶¶ 6, 43, 45, 50, 59; and the inferior quality of Tito & Tita's products, *id.* ¶¶ 62, 66. These allegations are sufficient to survive a motion to dismiss. *See Partners in Travel, Inc. v. Marshall*, No. CCB-19-435, 2020 WL 206701, at \*4 (D. Md. Jan. 14, 2020) (holding false association claim survived a motion to dismiss where it alleged similarity of marks, similarity of goods or services, and actual confusion). Tito & Tita does not make any specific argument to the contrary, instead contesting plaintiffs' allegations. ECF 15, 2–3. The Court will not resolve "contests surrounding the facts" on a motion to dismiss. *Butler*, 702 F.3d at 752.

Plaintiffs must also satisfy the two-part standing inquiry for § 43(a)(1) claims announced in *Lexmark Int'l., Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). The allegations must fall within the Lanham Act's zone of interests, and they must assert proximate causation to a cognizable injury. *Lexmark*, 572 U.S. at 129; *Belmora*, 819 F.3d at 710.

Regarding the statute's zone of interests, the Lanham Act has a detailed statement of purpose:

> The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

15 U.S.C. § 1127.  Plaintiffs allege defendants engaged in unfair competition.  ECF 2, ¶¶ 64–66, 76.  *Lexmark* defined "unfair competition" as concerned with "a commercial interest in reputation or sales."  *Lexmark*, 572 U.S. at 131–32.  Plaintiffs allege injury to both their sales and reputation, placing them well within the § 43(a)(1) zone of interests.  ECF 2, ¶¶ 60–62, 64–66.

Plaintiffs adequately allege proximate causation to a cognizable injury.  Proximate causation ensures "the harm alleged has a sufficiently close connection to the conduct the statute prohibits."  *Lexmark*, 572 U.S. 133.  This burden is met where the plaintiff can show "economic or reputational injury flowing directly from the deception wrought by the defendant's [conduct]; and that occurs when deception of consumers causes them to withhold trade from the plaintiff."  *Id.*  Plaintiffs allege that Tito & Tita's "hijacking" of its Facebook page preceded a loss of revenue and injury to their reputation arising from customer confusion, ECF 2, ¶ 60; that Tito & Tita encouraged followers of the Facebook page to order by phone or online, after changing the phone number to Tito & Tita's, *id.* ¶ 44; and that customers believed they had ordered from La Baguette when in fact they had ordered from Tito & Tita, *id.* ¶ 62.  Tito & Tita's only response is that the alleged revenue drop occurred in the early months of the pandemic.  ECF 15, at 3 n.1.  This possible alternative cause does not undermine the reasonable inference that the alleged drop could be the result of Tito & Tita's changes to the Facebook page, as it does not account for the confused and disappointed customers.  It also fails to address the alleged reputational injury.

Because plaintiffs have made factual allegations plausibly establishing false association under the Lanham Act, the motion to dismiss is denied as to Count I.

## B.  Unfair competition

Under Maryland law, unfair competition is the "damaging or jeopardizing another's business by fraud, deceit, trickery or unfair methods of any sort."  *Elecs. Store, Inc. v. Cellco*

*P'ship*, 732 A.2d 980, 991 (Md. Ct. Spec. App. 1999) (quoting *Balt. Bedding Corp. v. Moses*, 34 A.2d 338, 342 (Md. 1943)); *Farm Fresh Direct*, 2017 WL 4865481, at *10; *see also Thompson v. UBS Financial Services, Inc.*, 115 A.3d 125, 133 (Md. 2015) (reaffirming the rule).   This Court has previously observed that "the Maryland Court of Appeals 'has preserved a high degree of flexibility in the law of unfair competition.'"  *Farm Fresh Direct*, 2017 WL 4865481, at *10 (citing *Delmarva Sash & Door Co. of Md., Inc. v. Andersen Windows, Inc.*, 218 F.Supp.2d 729, 733 (D. Md. 2002)).

> What constitutes unfair competition in a given case is governed by its own particular facts and circumstances. Each case is a law unto itself, subject, only, to the general principle that all dealings must be done on the basis of common honesty and fairness, without taint of fraud or deception.

*Id.* (quoting *Balt. Bedding Corp.*, 34 A.2d at 342).   The rules of unfair competition preclude "the trading by one dealer upon the good name and reputation built up by another."  *Balt. Bedding. Corp.*, 34 A.2d at 342.   "The essential element of unfair competition is deception," such as where "the goods of one dealer are passed off as the goods of another, and the seller receives the profit which he would not have received except for such deception."  *GAI Audio of N.Y., Inc. v. Columbia Broad. Sys., Inc.*, 340 A.2d 736, 748 (Md. Ct. Spec. App. 1975).

Plaintiffs' common law unfair competition claim relies on the same general legal theory as their Lanham Act claim—that Tito & Tita is passing off its goods as somehow connected to La Baguette, resulting in customer confusion and injury to plaintiffs' business and reputation.   ECF 2, ¶¶ 59, 71–85; ECF 14, at 12.   The likelihood of confusion test for unfair competition claims under § 43(a) of the Lanham Act "is also applied to unfair competition claims under Maryland common law."  *Scotch Whisky Ass'n v. Majestic Distilling Co., Inc.*, 958 F.2d 594, 597 (4th Cir. 1992) (citing *Edmondson Vill. Theatre, Inc. v. Einbinder*, 116 A.2d 377, 379–80 (Md. 1955) ("[T]he acts complained of must be of such a nature as to mislead and deceive the public, so that

the defendant is in effect taking advantage of the good will and business reputation which the complainant has built up . . . .")).

The facts alleged in the complaint, taken as true, suggest that Tito & Tita surreptitiously and deceptively changed the name of plaintiffs' Facebook page to divert plaintiffs' customers and appropriate plaintiffs' goodwill, at least indirectly passing off its goods as plaintiffs'. *Supra*; ECF 2, ¶¶ 7, 43, 45-51, 59–60. These allegations state a claim for common law unfair competition.

Tito & Tita relies on its own version of the facts to attack plaintiffs' unfair competition claim. ECF 13-1, at 9–10. It claims that defendants "scrubbed nearly all references to Plaintiffs, the La Baguette name, and La Baguette products" from the page. ECF 15, at 4 n.2. This factual defense is irrelevant at this stage of the litigation because plaintiffs allege a different set of facts, and the Court must take plaintiffs' well-pleaded allegations as true. Next, Tito & Tita claims plaintiffs never owned the Facebook page and have no right to it, arguing that plaintiffs' allegation that they "have the property and/or ownership rights to [the] Facebook Page" is a "misstatement of fact and law." ECF 15, at 4. Tito & Tita cites no authority on this point, and the Court is not familiar with any Maryland precedent that would conclusively determine plaintiffs have no potential right to or interest in the Facebook page, assuming plaintiffs' allegations are true.[4]

Because plaintiffs have made factual allegations plausibly establishing common law unfair competition, the motion to dismiss is denied as to Count II.

---

[4] The law on the ownership of a social media pages created by employees for employers is evolving rapidly and varies between jurisdictions. *See generally*, Christopher A. Moore, *Find Out Who Your Friends Are: A Framework for Determining Whether Employees' Social Media Followers Follow Them to A New Job*, 39 CAMPBELL L. REV. 493 (2017); Courtney J. Mitchell, *Keep Your Friends Close: A Framework for Addressing Rights to Social Media Contacts*, 67 VAND. L. REV. 1459 (2014); Zoe Argento, *Whose Social Network Account? A Trade Secret Approach to Allocating Rights*, 19 MICH. TELECOMM. & TECH. L. REV. 201 (Spring 2013). If this litigation continues and defendants wish to repeat this argument, they should support their assertion that they own the Facebook page with authority.

## C. Tortious interference with prospective economic relations

Maryland courts have recognized two forms of tortious interference: "inducing the breach of an existing contract and, more broadly, maliciously or wrongfully interfering with economic relationships in the absence of a breach of contract." *Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 353 (4th Cir. 2013) (citing *Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 268 (Md. 1994)); *Phillips North America, LLC v. Hayes*, No. ELH-20-1409, 2020 WL 5407796, at *15 (D. Md. Sept. 9, 2020) (quoting *Blondell v. Littlepage*, 991 A.2d 80, 97 (Md. 2010)).  Plaintiffs claim the latter: tortious interference with prospective business or economic relations.

A claim of tortious interference has four elements: "(1) intentional and willful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting." *Phillips*, 2020 WL 5407796 at *14 (quoting *Kaser v. Fin. Prot. Mktg., Inc.*, 831 A.2d 49, 53 (Md. 2003)). Additionally, plaintiffs must prove the defendant's conduct was both an actual cause of the injury and its proximate cause. *Id.* (citing *Med. Mut. Liab. Soc. Of Maryland v. B. Dixon Evander & Assocs., Inc.*, 660 A.2d 433, 439–40 (Md. 1995) (actual cause), and *Jones v. Malinowski*, 473 A.2d 429, 435 (Md. 1984) (proximate cause)).  Plaintiffs must also identify the "possible future relationship which is likely to occur, absent the interference, with specificity." *Id.* (quoting *Mixter v. Farmer*, 81 A.3d 631, 638 (Md. Ct. Spec. App. 2013)) (internal quotation marks omitted).

"When a business relationship is not codified in a contract, a defendant has a 'broader right to interfere' with it, on the theory that such interference is, from a different perspective, simply competition in the marketplace." *Gorby v. Weiner*, No. TDC-13-3276, 2014 WL 4825962, at *9

(D. Md. Sept. 23, 2014) (quoting *Nat. Design, Inc. v. Rouse Co.*, 485 A.2d 663, 676 (Md. 1984)). "Thus where a defendant's purpose in interfering with a non-contractual business relationship is 'at least in part to advance his interest in competing' with one of the parties, he is not liable in tort for that interference unless the defendant acts with 'tortious intent' and by means which are themselves 'wrongful.'" *Id.* (quoting *Natural Design*, 485 A.2d at 676); *see also Macklin v. Robert Logan Assocs.*, 639 A.2d 112, 119–20 (Md. 1994) ("Thus, interference with another's contract or business relations in the name of competition is improper only if the means used are, in themselves, improper."). "Tortious intent is intent 'to harm the plaintiff or to benefit the defendant at the expense of the plaintiff.'" *Gorby*, 2014 WL 4825962, at *9 (quoting *Macklin*, 639 A.2d at 119). An illustrative list of qualifying "wrongful or unlawful" means includes "violence or intimidation, defamation, injurious falsehood or other fraud, violation of criminal law, and the institution or threat of groundless civil suits or criminal prosecutions in bad faith." *Phillips*, 2020 WL 5407796, at *15 (quoting *Berry & Gould, P.A. v. Berry*, 757 A.2d 108, 113 (Md. 2000)).

Plaintiffs plausibly state a claim for tortious interference with prospective business or economic relations. The complaint alleges wrongful conduct resulting in the diversion of prospective customers, and it contains facts from which the Court can infer tortious intent and malicious purpose. Specifically, plaintiffs allege they were injured by defendants' false representations and unfair competition. ECF 2, ¶¶ 43–51, 60, 64–66. They have identified future business relationships likely to occur absent defendants' misconduct, namely orders from the people who followed the Facebook page. *Id.* ¶ 59. They further allege several customers thought they were ordering from La Baguette when they were in fact ordering from Tito & Tita—specific potential business relations that would have occurred absent defendants' interference. *Id.* ¶ 62.

Defendants' sole argument is that plaintiffs have offered only speculation and conclusory assertions regarding defendants' state of mind, rather than specific facts, and have therefore not sufficiently pled the third element of tortious interference. ECF 13-1, at 10–11; ECF 15, at 5. While many of plaintiffs' allegations regarding defendants' state of mind are conclusory, e.g., "the Individual Defendants embarked upon a malicious strategy of diverting the Plaintiffs' customers to Tito & Tita," ECF 2, ¶ 32, plaintiffs also allege facts supporting a reasonable inference that defendants employed "injurious falsehood or other fraud," *Phillips*, 2020 WL 5407796, at *15, with the intent "to benefit [them] at the expense of the plaintiff[s]," *Gorby*, 2014 WL 4825962, at *9. Plaintiffs plausibly allege unfair competition and false association in violation of Maryland common law and the Lanham Act. ECF 2, ¶¶ 71–85; *supra*. They allege that defendants posted a message shortly after the "hijacking" seeking to divert people who followed the Facebook page, ECF 2, ¶ 44; that defendants passed off their goods as plaintiffs', *id.* ¶¶ 51, 59; and that customers were in fact diverted and ordered from Tito & Tita when they intended to order from La Baguette, *id.* ¶¶ 59, 62. These allegations, if proven, could constitute wrongful means undertaken with tortious intent, satisfying the third element of tortious interference.[5]

Because plaintiffs have plausibly alleged tortious interference with prospective business or economic relations, the motion to dismiss is denied as to Count III.

---

[5] Though the third element of tortious interference explicitly refers to malice, Maryland law does not require plaintiffs to prove malice in every case. *See Alexander & Alexander Inc. v. B. Dixon Evander & Assocs., Inc.*, 650 A.2d 260, 269–71 (Md. 1994) (stating tortious intent must be joined with wrongful or unlawful acts to satisfy the third element, and "[i]n addition, 'actual malice,' in the sense of ill will, hatred or spite, *may be sufficient* to make an act of interference wrongful where the defendant's malice is the primary factor that motivates the interference") (emphasis added).

**D. Conversion**

Maryland defines the tort of conversion as "any distinct act of ownership or dominion exerted by one person over the personal property of another in denial of his right or inconsistent with it." *Darcars Motors of Silver Spring, Inc. v. Borzym*, 841 A.2d 828, 835 (Md. 2004) (quoting *Allied Inv. Corp. v. Jasen*, 731 A.2d 957, 963 (Md. 1999)). The act of ownership "can occur either by initially acquiring the property or by retaining it longer than the rightful possessor permits." *Id.* Additionally, the defendant must have "an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights." *Id.* at 836 (quoting *Keys v. Chrysler Credit Corp.*, 494 A.2d 200, 208 (Md. 1985)). The requisite intent may exist despite good faith and the absence of consciousness of wrongdoing, "as long as there was an intent to exert control over the property." *Id.*

The personal property allegedly converted here is a Facebook page. The Maryland Court of Appeals has not squarely determined whether conversion extends to websites or social media pages. Because the law is unclear, the Court has "an obligation to interpret the law . . . as it appears that the Court of Appeals would rule." *Wells v. Liddy*, 186 F.3d 505, 527–28 (4th Cir. 1999); *see also Fairfax v. CBS Corp.*, 2 F.4th 286, 296 (4th Cir. 2021) (ruling that where the state high court has not interpreted a statute, "we must apply state law to predict how that court would rule").

Historically, conversion did not extend to intangible property because it "cannot be lost or found." *Sage Title Grp., LLC v. Roman*, 166 A.3d 1026, 1034–35 (Md. 2017). Maryland has "relaxed the general rule, though not so far as to 'extend the tort further, to cover completely intangible rights[.]'" *Id.* (quoting *Allied Inv. Corp. v. Jasen*, 731 A.2d 957, 965 (Md. 1999)). In 1999, the Maryland Court of Appeals referred to the Restatement (Second) of Torts (1965) and concluded:

We agree that the tort of conversion generally may extend to the type of intangible property rights that are merged or incorporated into a transferable document. We refuse, however, to extend the tort further, to cover completely intangible rights or as section 242(2) of the Restatement contemplates, to situations in which the relevant document itself has not been transferred. Thus, for [a] complaint to state a claim for conversion of [intangible property interests], it must have contained facts alleging that tangible documents evidenced those property interests and that the documents were transferred improperly to [the defendant].

*Jasen*, 731 A.2d at 965.

The Court of Appeals reaffirmed *Jasen* in 2015 and held that the transfer of some document, either physical or digital, embodying the right to the intangible property is necessary to a claim of conversion. *Thompson v. UBS Fin. Servs., Inc.*, 115 A.3d 125, 131–32 (Md. 2015). Examples of intangible property that may be converted via the transfer of a document include stock certificates, promissory notes, and life insurance policies. *Id.* at 131. In reaffirming *Jasen*'s rule, the Court of Appeals wanted to avoid "expand[ing] conversion so much that it could essentially swallow other torts, such as unfair competition and wrongful interference with contractual or business relations . . . ." *Id.* at 133.

Applying the holdings in *Jasen* and *Thompson* here, the Court concludes that the tort of conversion does not extend to a Facebook page. Plaintiffs describe the Facebook page as an "online advertising and promotional platform," not a digital document. ECF 2, ¶ 103. Consistent with this description, their allegations suggest the page is used to interact with potential customers and solicit business. *Id.* ¶ 35. They do not allege there is any external document that embodies the rights to the page. Thus, the Facebook page is not intangible property that can be converted under Maryland law. The Court's conclusion that Maryland would not recognize the conversion of a Facebook page is consistent with how other federal courts have interpreted Maryland law on the conversion of intangible property. *See, e.g., J & J Sports Prods., Inc. v. Md. Food & Ent., LLC*, No. ELH-11-3344, 2012 WL 5289790, at *7 (D. Md. Oct. 24, 2012) (holding Maryland law

would not recognize the conversion of broadcast television signals); *Xereas v. Heiss*, 933 F. Supp. 2d 1, 6 (D.D.C. 2013) (citing Maryland law as persuasive authority and dismissing a claim for the conversion of a domain name).

Because plaintiffs have not alleged the conversion of property that may be the subject of conversion under Maryland law, the motion to dismiss is granted as to Count V.

### E. Detinue

Plaintiffs plead detinue and conversion as two separate claims, ECF 2, ¶¶ 93–106, but the parties addressed them as a singular issue in their subsequent filings, ECF 13-1, at 11–12; ECF 14, at 15–16; ECF 15, at 6. The Court concludes conversion and detinue are indeed sufficiently intertwined that Maryland law also precludes a detinue action for the return of intangible property not embodied in some document.

Under Maryland law, "detinue lies for the recovery of personal chattels unjustly detained by one who acquired possession of them either lawfully or unlawfully, or the value of them if they cannot be regained in specie." *Durst v. Durst*, 169 A.2d 755, 756 (Md. 1961). A complaint for detinue must contain: "(1) a description of the property claimed and an allegation of its value, (2) an allegation that the defendant unjustly detains the property, (3) a claim of return of the property or payment of its value, and (4) any claim for damages to the property or for its detention." Md. R. 12-602(c).

Detinue, unlike conversion, is codified by the Maryland Rules. *See* Md. Rule 12-602. Rule 12-602(a)(1) provides: "A person claiming the right to possession of personal property may file an action under this Rule." The Maryland Rules do not define "personal property," only "property." The latter means "real, personal, mixed, tangible, and intangible property of any kind." Md. Rule 1-202(y). However, no Maryland court has interpreted "personal property" in Rule 12-

602(a)(1) to incorporate the definition of "property" from Rule 1-202(y), and the Court finds no reason to do so. The limiting modifier in Rule 12-602(a)(1) directly conflicts with part of the broader definition of "property" in Rule 1-202(y).

As far as the Court is aware, only on two occasions has a court applying Maryland law addressed a claim for the detinue of intangible property. In both cases, the detinue claims concerned a document embodying the intangible property. *See, e.g., Durst*, 169 A.2d at 178–80 (addressing detinue claim for the document embodying a life insurance policy and stating "[i]t is settled law in Maryland that life insurance policies are choses in action, and as such may be the subject of a conversion") (citations omitted); *Mylander v. Chesapeake Bank of Balt.*, 159 A. 770 (Md. 1932) (concerning shares of stock). Otherwise, courts have addressed detinue only in cases involving tangible personal property. *See, e.g.*, *Washburn v. Clark*, No. TDC-20-2123, 2021 WL 2042672, at *4 (D. Md. May 21, 2021) (finding plaintiff failed to state a detinue claim against real property because detinue must concern personal property), *aff'd*, 858 F. App'x 653 (4th Cir. 2021), *cert denied*, No. 21-6641, 2022 WL 516172 (U.S. Feb. 22, 2022); *111 Scherr Lane, LLC v. Triangle Gen. Contracting, Inc.*, 163 A.3d 248 (Md. Ct. Spec. App. 2017) (wooden poles, a trailer, and black walnut wood); *Wallander v. Barnes*, 671 A.2d 962 (Md. 1996) (vehicle). Given the dearth of precedent distinguishing detinue from conversion or otherwise addressing the detinue of intangible property, the Court will err against expanding Maryland law where the Maryland courts have not so much as hinted they may do so. Accordingly, the Court concludes the rule limiting the conversion of intangible property to cases where the rights to the property are embodied in some document also extends to detinue actions under Maryland law.

Because plaintiffs have not described property that may be the subject of a detinue action under Maryland law, the motion to dismiss is granted as to Count IV.

**F. Breach of fiduciary duty**

To establish a breach of fiduciary duty, plaintiffs must show: "(i) the existence of a fiduciary relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the beneficiary." *Plank v. Cherneski*, 231 A.3d 436, 466 (Md. 2020) (quoting *Forelich v. Erickson*, 96 F.Supp.2d 507, 526 (D. Md. 2000) (citing and applying Maryland law), *aff'd sub nom., Froelich v. Senior Campus Living, LLC*, 5 F. App'x 287 (4th Cir. 2001)).

Maryland law recognizes a fiduciary duty owed by high-echelon employees to their employers to not compete during the tenure of their employment, "even in the absence of an express covenant so providing." *Md. Metals, Inc. v. Metzner*, 382 A.2d 564, 568 (Md. 1978) (citing *Ritterpusch v. Lithographic Plate Serv.*, 119 A.2d 392, 396–97 (Md. 1956)).  Thus, employees "must refrain from actively and directly competing with [their] employer for customers and employees, and must continue to exert [their] best efforts on behalf of [their] employer." *Id.* However, to safeguard "society's interest in fostering free and vigorous competition in the economic sphere," Maryland courts have recognized "a privilege in favor of employees which enables them to prepare or make arrangements to compete with their employers prior to leaving the employ of their prospective rivals without fear of incurring liability for breach of their fiduciary duty of loyalty." *Id.* at 568–69.  The privilege is not absolute and does not cover cases "where the employee has committed some fraudulent, unfair or wrongful act in the course of preparing to compete in the future," including the solicitation of customers. *Id.* at 569–70 (citing *Ritterpusch*, 119 A.2d at 396–97); *see also Crawford & Co. v. M. Hayes & Assocs., LLC*, 13 F. App'x 174, 176 (4th Cir. 2001) (discussing the privilege and what conduct would not qualify).

Plaintiffs have alleged that Mazariegos and Ayala qualify as high-echelon employees. They assert that both Mazariegos and Ayala were "trusted supervisory employees" with substantial

duties who each "gained extensive knowledge of certain aspects of the Plaintiffs' business." ECF 2, ¶¶ 26–31. Rather than contest their status as high-echelon employees, Mazariegos and Ayala argue plaintiffs have not alleged a breach of fiduciary duty because the allegations show they did no more than "prepare or make arrangements to compete . . . prior to leaving" La Baguette. ECF 13-1, at 13. The Court disagrees.

In the case of Mazariegos, plaintiffs allege several ways he may have breached his fiduciary duty while in plaintiffs' employ. They allege Mazariegos committed "some fraudulent, unfair or wrongful act" in preparing to compete by surreptitiously taking over the Facebook page on behalf of his competing business, which may have been a violation of the Lanham Act, one or more torts under Maryland law, and a breach of his non-compete agreement.[6] ECF 2, ¶¶ 59, 71–128. Additionally, they allege he falsely assured plaintiffs that Tito & Tita did not sell baked goods in direct competition with La Baguette when it in fact did. ECF 2, ¶¶ 41, 52. All this alleged misconduct occurred on April 12, preceding Mazariegos's termination on April 16. *Id.* ¶ 52.

Whether plaintiffs have alleged that Ayala breached her fiduciary duty is a closer question. Regarding Ayala, plaintiffs allege only that Tito & Tita "had been operational at least as early as March of 2020," *id.* ¶ 57; that they noticed "a lack of attention and an increase in absenteeism" by Ayala beginning in March of 2020, *id.* ¶ 39; and that she expressed concerns about COVID-19 and missed nearly three weeks of work immediately prior to her termination on April 12, *id.* ¶ 40. While plaintiffs also allege that Ayala was involved in using the Facebook page to pass off Tito &

---

[6] Defendants argue that the alleged decision to appropriate the La Baguette Facebook page was "simply a preparatory act - - as any individual looking to start a business would naturally seek to establish a web domain prior to commencing actual business operations." ECF 15, at 7 n.3. This argument ignores the allegation that the page already served as a platform for Mazariegos's employer, as well as the fact that the alleged name change and related conduct was potentially wrongful under state and federal law.

Tita's goods as La Baguette's, this alleged misconduct (including the foundational name change) occurred after Ayala's termination on April 12. *Id.* ¶ 40. Thus, plaintiffs do not allege Ayala committed any "fraudulent, unfair or wrongful act" in preparing to compete with them while employed by them. They must, therefore, allege she actually competed with plaintiffs while she worked for them. From the above allegations, and particularly the allegation that plaintiffs learned on April 16 that Tito & Tita was selling baked goods, *id.* ¶ 52, there is a reasonable inference that Ayala spent time prior to her termination working for Tito & Tita and selling baked goods in direct competition with La Baguette. The claim as to Ayala narrowly survives a motion to dismiss.

Because plaintiffs have plausibly alleged that both Mazariegos and Ayala breached their fiduciary duties, the motion to dismiss is denied as to Count VI.

### G. Breach of contract

Plaintiffs claim that Mazariegos breached the non-compete agreement he allegedly signed days before he was terminated. Non-compete agreements "are in restraint of trade, and their validity depends on their reasonableness." *Premier Rides, Inc. v. Stepanian*, No. MJG-17-3443, 2018 WL 1035771, at *5 (D. Md. Feb. 23, 2018) (quoting *Mansell v. Toys R Us, Inc.*, 673 F. Supp. 2d 407, 416 (D. Md. 2009) (citing *Ruhl v. F.A. Bartlett Tree Expert Co.*, 225 A.2d 288, 291 (Md. 1967))). "Under Maryland law, an employer seeking to enforce a restrictive covenant must establish that the agreement was supported by adequate consideration and that the following four conditions are met:

> (1) The employer must have a legally protected interest; (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest; (3) the covenant cannot impose an undue hardship on the employee; and (4) the covenant cannot violate public policy."

*Id.* (quoting *Becker v. Bailey*, 299 A.2d 835, 838 (Md. 1973)). Mazariegos does not discuss these conditions in his filings.[7] Mazariegos argues instead that, first, the non-compete was not supported by adequate consideration, and second, the express remedy for breach of the non-compete—Mazariegos's termination—already occurred and there is no other remedy available. ECF 13-1, at 15–16.

### 1. Adequacy of the consideration

Mazariegos asserts that the "non-competition mandate" did not confer any benefit on him in exchange for his adherence to it, ECF 15, at 9, which he argues results in a lack of consideration and renders the alleged agreement unenforceable, ECF 13-1, at 16. However, plaintiffs allege that Mazariegos's assent to the non-compete was a condition of his continued at-will employment. ECF 2, ¶ 42. They further allege they continued to employ him for four days until discharging him for cause. *Id.* ¶ 52. If true, this would constitute valid consideration under Maryland law.

*Simko, Inc. v. Graymar Co.*, 464 A.2d 1104 (Md. 1983), is the cornerstone Maryland case on this issue. *See Premier Rides*, 2018 WL 1035771, at *6 (applying *Simko*). The *Simko* Court adopted a rule that courts should "look to the facts and circumstances of each case" to determine whether there was sufficient consideration for a non-compete agreement. *Simko*, 464 A.2d at 1107–08. Specifically, the Court advised that "[w]ere an employer to discharge an employee without cause in an unconscionably short length of time after extracting the employee's signature to a restrictive covenant through a threat of discharge, there would be a failure of consideration,"

---

[7] The non-compete agreement, as alleged, satisfies each condition. Plaintiffs had a legally protected interest in preventing a current employee from competing against them. *Supra*. The non-compete was limited to Mazariegos's term of employment, so it was narrow in scope and duration and did not impose any undue hardship on him. Finally, "the public has an interest in the enforcement of reasonable restrictive covenants" that do not stifle healthy competition. *Premier Rides*, 2018 WL 1035771, at *9.

but "the continuation of employment for a substantial period beyond the threat of discharge is sufficient consideration for a restrictive covenant." *Id.* In reaching this rule, the Court first noted that the majority position in other jurisdictions was to hold "that continued employment of an at-will employee does constitute sufficient consideration for a restrictive covenant . . . ." *Id.* The Court then observed "courts in the majority position have found sufficient consideration for the restrictive covenant in either the agreement not to discharge or in the continued employment for a substantial period of time after execution of the restrictive covenant." *Id.* Considering the facts before it, the Court found there was consideration for the non-compete because the employer—who had made an express threat of discharge if the employee did not sign the agreement—continued to employ the employee for ten years after executing the restrictive covenant. *Id.*

*Simko* and its progeny concern agreements that restrict an employee's ability to compete with her employer *after* her employment ends. Here, the alleged non-compete agreement is expressly limited to the term of employment. ECF 2, at 39 (Ex. A). Additionally, *Simko*'s guidance about discharge after "an unconscionably short length of time" assumes discharge "without cause." *Simko*, 464 A.2d at 1107. While plaintiffs allegedly discharged Mazariegos only four days after he signed the non-compete, they allege he was discharged for violating the non-compete. He was free to begin competing with them the moment his employment terminated. Guided by the reasoning in *Simko* and in the absence of contrary authority, the Court concludes that Mazariegos's continued at-will employment, as alleged in the complaint, was reasonable consideration for an agreement that restricted his behavior only during his employment.

### 2. Availability of additional remedies

The alleged non-compete agreement states, "Any employee who violates this non-compete agreement will be terminated from Pan 4 America / Super Pastel [sic] LLC." ECF 2, at 39 (Ex.

A).  Mazariegos argues this language provides an exclusive remedy and forecloses other relief, including damages.  ECF 13-1, at 16–17.

Maryland law is clear that the specification of one remedy in a contract does not foreclose other remedies.  "A contract will not be construed as taking away a common-law remedy unless that result is imperatively required."  *Mass. Indem. & Life Ins. Co. v. Dresser*, 306 A.2d 213, 217 (Md. 1973).  The Court of Appeals recently reaffirmed this rule.  *O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 135 A.3d 473, 481–82 (Md. 2016) ("Reviewing our case law, we discern that the parties must use clear language to show their agreement to limit available remedies.") (citing *Dresser*, 306 A.2d at 369–70).  *See also* 17A Am. Jur. 2d Contracts § 709 (Feb. 2022) ("Where a contract prescribes a remedy for a breach, that remedy is generally exclusive if the contract so declares or clearly shows the parties' intention to make it so.  Where, however, there is no express or implied limitation in the contract making the stated remedy exclusive, the prevailing view is that a party may pursue either the prescribed remedy or any other remedy the law provides.").

The terms of the non-compete, as alleged, do not expressly limit available remedies.  Because Maryland law assumes the availability of other common law remedies absent express language, plaintiffs' remedies for breach of contract, if breach is proven, are not limited to the termination of Mazariegos' employment.

Because plaintiffs have plausibly alleged breach of contract, the motion to dismiss is denied as to Count VIII.

### H.  Unjust enrichment

Unjust enrichment requires proof of three elements: "(1) A benefit conferred upon the defendant by the plaintiff; (2) An appreciation or knowledge by the defendant of the benefit; and (3) The acceptance or retention by the defendant of the benefit under such circumstances as to

make it inequitable for the defendant to retain the benefit without payment of its value." *Hill v. Cross Country Settlements, LLC*, 936 A.2d 343, 351 (Md. 2007) (quoting *Berry & Gould*, 757 A.2d at 113).

Plaintiffs plausibly allege unjust enrichment. Plaintiffs claim that the "benefit conferred" is the Facebook page and any associated goodwill. ECF 2, ¶ 126. They allege the page was created for their benefit. *Id.* ¶¶ 4, 33, 94. By allegedly keeping the Facebook page, defendants kept a platform on which established customers (of La Baguette) could receive messages from their business and place additional orders. There is unquestionably value there, at the very least in the form of the customers who plaintiffs allege intended to order from La Baguette but in fact ordered from Tita & Tita. *Id.* ¶ 62. Plaintiffs' allegations also give rise to the reasonable inference that defendants appreciated the benefit. Immediately after changing the name, defendants replaced La Baguette's contact information with their own and encouraged orders through the page. *Id.* ¶¶ 43–44. When plaintiffs requested access to the page, Mazariegos provided information that did not work, allowing defendants to keep the page. *Id.* ¶ 53. On the third element, plaintiffs allege it would be unjust to let defendants keep the page. *Id.* ¶ 127. As factual support for that conclusion, they allege that Mazariegos was acting within the scope of his employment when he helped generate the goodwill, *id.* ¶¶ 26, 34, 94, as well as harm to their reputation and concrete examples of lost business, *id.* ¶ 59–62.

Defendants argue, again, that plaintiffs have no interest in or right to the Facebook page because Mazariegos supposedly made it on his Facebook account and without explicit instruction from plaintiffs. ECF 13-1, at 17; ECF 15, at 9–10. As discussed earlier, plaintiffs allege they did own the page because Mazariegos created it at their instruction and in the scope of his employment. The Court will not resolve this factual dispute on a motion to dismiss.

Because plaintiffs have made factual allegations plausibly establishing unjust enrichment, the motion to dismiss is denied as to Count IX.

## I.  Civil conspiracy

A claim of civil conspiracy requires proof of three elements: "(1) a confederation of two or more persons by agreement or understanding; (2) some unlawful or tortious act done in furtherance of the conspiracy or use of unlawful or tortious means to accomplish an act not in itself illegal; and (3) actual legal damage resulting to the plaintiff." *Lloyd v. Gen. Motors Corp.*, 916 A.2d 257, 284 (Md. 2007) (quoting *Van Royen v. Lacey*, 277 A.2d 13, 14–15 (Md. 1971)) (internal quotations omitted).  Conspiracy is "not a separate tort capable of independently sustaining an award of damages in the absence of other tortious injury to the plaintiff." *Id.* (quoting *Alleco Inc. v. Harry & Jeanette Weinberg Found., Inc.*, 665 A.2d 1038, 1044–45 (Md. 1995)).

The parties appear to agree that plaintiffs allege confederation.  Indeed, many of plaintiffs' allegations concerning the period after Mazariegos's termination refer to both individual defendants.  For example, "Defendants falsely advertised and passed off their competing business and products as those of the Plaintiffs . . . ."  ECF 2, ¶ 59.  Defendants' only argument regarding the conspiracy claim is that it cannot stand alone and requires a cognizable underlying tort.  ECF 13-1, at 15.  Here, there are several: a violation of the Lanham Act, common law unfair competition, tortious interference, breach of fiduciary duty, and breach of contract.  Because these claims survive defendants' motion to dismiss, the conspiracy claim does as well.

Because plaintiffs have plausibly alleged civil conspiracy, the motion to dismiss is denied as to Count VII.

## IV.    Conclusion

Disregarding, as it must, defendants' factual disputes at this early stage, the Court holds that plaintiffs have plausibly alleged all counts except Count IV (Detinue) and Count V (Conversion).  Accordingly, Counts IV and V are dismissed.  Defendants are to file their answer to plaintiffs' complaint by March 24, 2022.  Fed. R. Civ. P. 12(a)(4)(A).


DATED this 3rd day of March, 2022.


Deborah L. Boardman
United States District Judge